## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| INTEGRITY ENERGY, LTD., | ) | CASE NO.: 1:18-CV-00978 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| JERRAN HUNTER, *et al.*, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on Plaintiff Integrity Energy, Ltd.'s ("Integrity" or "Plaintiff") Motion to Enforce the Settlement Agreement. (ECF #10)[1]. Defendants, IPO Washington Group d/b/a Complete Business Solutions ("CBS"), Jerran Hunter ("Defendant Hunter"), and Amber Acoff ("Defendant Acoff") (collectively, "Defendants") filed an Opposition to Plaintiff's Motion to Enforce the Settlement Agreement (ECF #24) and Plaintiff filed a Reply (ECF #25).

The Court conducted an evidentiary hearing on March 22, 2021 through March 29, 2021, and the parties submitted Post-Hearing Briefs and Proposed Findings of Fact and Conclusions of Law (ECF #236, ECF #239, and ECF #240) and Supplemental Briefings on the issues of damages and attorneys' fees. (ECF #242 and ECF #246). Plaintiff then filed a Motion to Strike (ECF #248), Defendants' filed an Opposition (ECF #249), and Plaintiff filed a Reply.[2] (ECF #250).

---

[1] Plaintiff filed its "Motion for Leave to File Redacted Motion to Enforce Settlement Agreement with Memorandum in Support, *Instanter*" (ECF #10) and accompanying Brief in Support (ECF #10-2) on July 10, 2019. In the interest of brevity, the Court refers to ECF #10 and its attachments as Plaintiff's Motion to Enforce the Settlement Agreement.

[2] On May 29, 2021, Plaintiff filed a Motion to Strike Portions of, and Exhibits J and K, to Defendants' Response to Plaintiff's Supplemental Post-Hearing Submission Pertaining to Enterprise Value Damages and Attorneys' Fees (ECF #248). The Court will only consider that which is relevant and appropriate under the Federal Rules of Evidence and

For the reasons that follow, the evidence clearly establishes that Defendants engaged in numerous breaches of the Agreement, resulting in harm and damages, and Plaintiff's Motion to Enforce the Settlement Agreement (ECF #10) is hereby **GRANTED**.

## I. FACTS AND PROCEDURAL HISTORY

This matter commenced on April 30, 2018 when Integrity initiated an action against CBS, Mr. Hunter, Ms. Acoff, and Mr. Thomas[3] for misappropriation of trade secrets, breach of contract, tortious interference with contract and business relationships, punitive damages, and injunctive relief. (Verified Complaint, ECF #1). Integrity, headquartered in Cleveland, Ohio, and CBS, operating from offices in Cleveland and most recently, Euclid, Ohio, both sell energy, natural gas, demand response, and other power services to commercial and residential customers in and outside the state of Ohio. (ECF #1 ¶¶ 13-19; ECF #230 PageID 7905; ECF #228, PageID 7398-7400). CBS is co-owned by Defendant Hunter and Mr. Brian Gilmore, both former employees of Integrity, and Ms. Andrea Staples, wife of Mr. Robert Staples. (ECF #230, PageID 7830).

With assistance of counsel, the parties resolved Plaintiff's claims, entering into a settlement agreement on June 22, 2018 (the "Settlement Agreement") (ECF #14), and Integrity agreed to a payment from Defendants in the amount of $1,110.44 for profits generated by Ms. Acoff in the State of Ohio. (Pl. Ex. 128 at ¶ 13; Pl. Ex. 146A at HUNTER000697). The Court entered an Order

---

the Federal Rules of Civil Procedure. Pursuant to Fed. R. Evid. 408(a), the submission of statements and communications made during the parties' negotiations are improper for the Court's consideration and Exhibit J is hereby stricken from the record. The criteria under Fed. R. Civ. P. 68(d) is not satisfied and Exhibit J is therefore irrelevant.

[3] Mr. Darian Thomas, a former Integrity employee who subsequently worked for CBS, was named in the initial lawsuit but is not a subject of the present Motion to Enforce.

dismissing the action with prejudice (ECF #8) and the parties filed a Stipulated Notice of Dismissal on July 2, 2018, noting the Court would retain jurisdiction over the Agreement. (ECF #9).[4]

The terms of the Agreement restrict Defendants from engaging in certain competitive conduct, such as the solicitation, employment, or acceptance of services from former Integrity employees subject to non-competes, and the Agreement defines "Defendants" to include Mr. Hunter, Ms. Acoff, CBS, and its:

> parents, subsidiaries, and affiliates, and all of their respective past and present owners, shareholders, officers, directors, employees, independent contractors, agents, attorneys, insurers, successors, and assigns.

(*See* ECF #14, PageID 244, and ¶¶ 10(a), 10(b) and 10(c)).[5] Paragraphs 6 and 7 require those employed by CBS who previously worked for Integrity to return Plaintiff's "property and

---

[4] The parties' Settlement Agreement explicitly states that this Court and Case Number (1:18-cv-00978) are the only place for resolution of any disputes. (ECF # 14, at ¶ 18).

[5] Pertinent provisions of the Agreement:

**10. CBS's Agreements to Not Hire and to Not Solicit**

**10(a):** CBS acknowledges and represents that other than Hunter, Acoff, Brian Gilmore and Chioma Okoronkwo, it is not accepting services or work from any current or former Integrity employees. Within seven (7) calendar days of the effective date of this Agreement, Integrity will provide CBS with all restrictive covenants applicable to the listed employees and CBS will honor those agreements subject to the terms of this Agreement. Further, CBS will instruct the employees referenced in this paragraph, in writing, to abide by their agreements with Integrity, subject to the terms of this Agreement.

**10(b):** Defendants, including all other current employees or agents of Defendants, are prohibited from employing, contracting with, or accepting services from any current or former Integrity employees, contractor or vendor was has an Integrity non-competition agreement in effect at the time employment or contracting is sought. To the extent that CBS employees or receives services from an individual who was employed or engaged in violation of this provision, CBS agrees to immediately notify Integrity in writing and terminate any employment or relationship with that individual no later than within five (5) days of learning of the violation.

**10(c):** Defendants, including all other current employees or agents of Defendants, are prohibited from soliciting or encouraging any current employee to terminate his/her employment or contractual relationship with Integrity. To the extent that CBS employs or receives services from an individual who was solicited or encouraged in violation of this provision, CBS agrees to immediately notify Integrity in writing and terminate any employment or relationship with that individual no later than five (5) days of learning of the violation.

information," and prohibits Defendants from using or disclosing any of Integrity's trade secrets or confidential information. (*Id.* at ¶¶ 6-7)[6]. Paragraph 8 of the Agreement applies specifically to Defendant Acoff, prohibiting her from "providing any energy-related services or sales to CBS within the State of Ohio" for a two-year period ending June 22, 2020. (ECF # 14, ¶ 8(b)).

In early June of 2019, Plaintiff learned that several individuals subject to Integrity non-competes were providing services to, or being solicited for work, by Defendants. On June 6, 2019, Integrity's counsel notified Mr. Boseman, counsel for Defendants, that Plaintiff suspected CBS was in breach of the Agreement. In response, Defendants identified four former Integrity employees, Mr. Hunter, Ms. Acoff, Mr. Gilmore, and Chioma Okoronkwo, as individuals currently working for or otherwise providing services to CBS. (ECF #239-1, ¶ 19). Plaintiff attempted further written correspondence with Defendants regarding its concerns that additional former employees were involved, and CBS denied wrongdoing. On July 10, 2019, Integrity filed its Motion to Enforce the Settlement Agreement. (ECF #10-1).

The Court held conferences in September and December of 2019, during which the parties argued discovery was necessary, and the Court agreed to permit discovery prior to ruling on

---

[6]

**6. Return of Integrity's Property and Information**: Defendants and any former employee who is employed by CBS will return to Integrity all of Integrity's property and information and verify via affidavit that they no longer have any property or information belonging to Integrity. Integrity's property and information includes, but not limited to, any customer, client, and employee contact information, customer contract information, contract start and end dates…Defendants' agree to return the property and information to Integrity and securely delete it within ten (10) calendar days of the effective date of this agreement.

**7. Defendants' Agreement to Not Use or Disclose Integrity's Protected Information**: Defendants and any other person or entity acting in aid or concert, or in participation with them are prohibited from otherwise using or disclosing any of Integrity's trade secrets or confidential information as defined in the Hunter Agreement, the hunter Settlement Agreement, the Acoff Agreement, and the Thomas Agreement.

Plaintiff's Motion to Enforce.[7] For well over a year, the parties engaged in extensive discovery involving motion practice, requests for production of documents, and depositions.

The Court held an evidentiary hearing on Plaintiff's Motion to Enforce the Settlement Agreement on March 22, 2021 through March 29, 2021, during which seven (7) witnesses provided testimony: Defendant Hunter, Dominick Pearson, Brian Gilmore, Madison Clement, Paul Nero, Mike Naughton, and Plaintiff's Expert Mark Bober ("Expert Bober"). Following the hearing, the parties submitted Post-Hearing Briefs and Proposed Findings of Fact and Conclusions of Law (ECF #236, ECF #239, and ECF #240) and Supplemental Briefings on the issues of damages and attorneys' fees. (ECF #242 and ECF #246).

## II.    LAW AND ANALYSIS

### A.    <u>Enforcement of the Settlement Agreement</u>

Integrity requests the Court enter an Order enforcing the terms of the June 22, 2018 Settlement Agreement. (ECF #10). "Settlement agreements are a type of contract subject to principles of state contract law." *Reed v. Whermann*, 159 F.Supp.2d 700, 704 (S.D. Ohio 2001). "To allege a breach of contract claim under Ohio law, the plaintiff must establish (1) the existence of a binding contract; (2) Plaintiff's performance; (3) breach; and (4) damages." *Hicks v. Bryan Medical Group, Inc.*, 287 F. supp. 2d 795 (N.D. Ohio 2003). The parties concede that the Agreement is governed by the laws of the state of Ohio (ECF # 14, at ¶ 18), and that the terms of the Agreement were jointly reached after negotiation and review by counsel for both parties. (Hunter ECF #228, PageID 7404-7405, 7487-7488; Pl. Ex. 146A at HUNTER000710).

---

[7] On April 6, 2020, the Court noted in its Memorandum Opinion and Order docket entry (ECF #110) that "based on the arguments raised by the Parties' in briefing and the limited information available to the Court, the question of whether Defendants breached the settlement agreement may require clarification of the terms and circumstances of the underlying non-compete agreements, along with the nature and breadth of Defendants' business activities and the individuals and entities involved. The Court reminds the Parties that the only issue before the Court is whether the settlement agreement was breached."

The Sixth Circuit has explained that a district court possesses broad, inherent authority and equitable power to enforce the terms of a settlement agreement entered into by the parties to litigation. *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988) (quotations and citations omitted). Although courts have broad authority, "[t]he court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." *Brock*, 841 F.2d at 154.

### B. Defendants' Breaches of the Settlement Agreement

Hearing evidence shows Defendants have engaged in prohibited conduct under the terms of the Agreement since its execution in June of 2018. CBS, like Integrity, relies on sales personnel to sell energy (gas and electric) to commercial and residential customers in and outside the state of Ohio. (ECF #1, ¶ 15). CBS employs a door-to door sales team and generates revenue from its inside commercial sales team, which evidence demonstrates is comprised of a number of former Integrity employees in violation of the Agreement.

Prior to executing the Agreement, CBS accepted the services of Robert Staples, Robert Heinrich, and Madison Clement, all of whom had active non-competes with Integrity. (Hunter ECF #228, PageID 7426-7427, 7428-7435; 7453-7456, 7484-7487; 7579-7581; Clement EF #229, PageID 7650-7651; Pl. Ex. 51A; Pl. Ex. 146A). Approximately a year after the parties' signed the Agreement, CBS concealed it was employing Mr. Staples, Mr. Heinrich, and Ms. Clement, in violation of its obligations under Paragraph 10(a) of the Agreement.

Despite knowingly accepting services from him in contravention of the Agreement, CBS worked closely with Mr. Staples and permitted his extensive participation in all aspects of its business operations, including recruitment, training, and finances. As Director of Operations of Consumers Energy Bureau ("Consumers" or "CEB"), an entity operated and controlled by

Defendants, Mr. Staples played a pivotal role in soliciting services and generating revenue from former Integrity employees, in attempt to circumvent the provisions of the Agreement.

Evidence shows Defendants, with the assistance of Mr. Staples, solicited and accepted services from at least seven (7) other former Integrity employees subject to non-competes, including (1) Robert Heinrich, (2) Madison Clement, (3) Rebecca Ward, (4) Ciairrea Efford, (5) Latoya Robinson, (6) Margaret McLaughlin, and (7) John Kennedy, in violation of Paragrapghs 10(b) and 10(c) of the Agreement.[8] (Pearson ECF #229, PageID 7792, 7797-7799; Hunter ECF #229, PageID 7597-7598).

### i. Failure to Identify Restricted Employees in Violation of Paragraph 10(a)

Plaintiff argues Defendants violated Paragraph 10(a) of the Agreement, which requires Defendants to "acknowledge[] and represent[]" the persons from whom it was "accepting services or work," by failing to identify three (3) former Integrity employees, Mr. Staples, Mr. Heinrich, and Ms. Clement, all of whom were subject to Integrity non-competes and provided services to Defendants prior to the execution of the Agreement. (Pl. Ex. 128). When Plaintiff notified Defendants' of its suspected breach in June of 2019, CBS acknowledged and represented that only, "Hunter, Acoff, Brian Gilmore, and Chioma Okoronkwo" had been providing services or work for CBS. (*Id.* at. ¶10(a)).

---

[8] The dates of employment at Integrity are undisputed and were identified in Paul Nero's affidavit at Pl. Ex. 259 and during his direct testimony at the hearing. (Nero ECF #230, PageID 7904-7924). Dates of employment with Integrity Energy: Robert Staples: 7/7/2010 until 1/24/2018 (Pl. Ex. 259); (2) Robert Heinrich: 1/5/2017 until 3/26/2018 (Pl. Ex. 259); (3) Madison Clement: left Integrity the first time 2/23/2018 and was re-employed after this time from 6/2019 until she resigned in 2020, but the operative period for purposes of determining breach relate to her first period of employment; (4) Rebecca Ward: 6/1/2017 until 9/19/2017 (Pl. Ex. 259); (5) Margaret McLaughlin: 9/15/2015 until 1/29/2019 (Pl. Exs. 252,259); (6) Ciairrea Efford: 2/8/2012 until 5/21/2019 (Pl. Exs. 116, 240, 259); (7) Latoya Robinson: 2/21/2011 until 3/8/2019 (Pl. Exs. 102, 259); (8) John Kennedy: left Integrity 2/23/2018 (ECF #236-3).

1. **Robert Staples and Consumers Energy Bureau ("CEB")**

Robert Staples was employed by Integrity until January of 2018 and was subject to a non-compete agreement which expired on January 24, 2020. (Pl. Ex. 4, at p. 24-29). At the time of his departure, Mr. Staples worked as a Sales Manager and was responsible for overseeing employee paperwork, including Integrity's non-compete agreements. (Nero ECF #230, PageID 7910). Around the time he left Integrity, Mr. Staples engaged in discussions with and forwarded his Integrity non-compete to Defendant Hunter. (Pl. Ex. 51A).

Despite knowledge of his non-compete and the terms of the Agreement, CBS allowed Mr. Staples to participate extensively in all aspects CBS's business operations.[9] Evidence shows he maintained regular communication with Mr. Hunter and Mr. Gilmore, and provided a wide variety of services to Defendants, including recruiting, hiring, and training; correspondence with vendors, contractors and suppliers; payroll administration, commission structure, owners' payouts, and expenses; initiating sales contests; and overseeing employee performance. (ECF #240-1, PaeID 8634; Pl. Exs. 215, 216, 218, 243, 262, 236, 265, 266).[10] Mr. Staples represented himself as CBS's Chief Financial Officer on a group insurance benefits application, and conducted business,

---

[9] Evidence shows the following conduct by Mr. Staples: He communicated on CBS's Direct Sales Team group message and regularly created contests for CBS's sales teams. (Pl. Exs. 251 and 146A at HUNTER000707; He had access to CBS's "sensitive" financial data and legal communication. (*See e.g.*, Pl. Ex. 146A at HUNTER000697, 699, 716; Pl. Ex. 51A at R. STAPLES001520, 001540-1541; Pl. Ex. 52A; Pl. Ex. 74A; He authorized CBS employee-related decisions pertaining to hiring, discipline, compensation, payroll, and benefits. (See Pl. Exs. 51A, 52A, 74A, 146A, 202A, 203, 220, 251, 263, 266; He drafted CBS's training manual. (Pl. Ex. 217); He discussed CBS's agreements with and payments from energy supplies (Pl. Ex. 146A at HUNTER000696), and was asked to send out an energy license for the State of Ohio and complete CBS's application to become a SouthStar energy broker (HUNTER000672 and Pl. Exs. 243 and 215); He filled out an insurance application and indicated he worked as CBS's CFO. (Pl. Ex. 62A); He had regular access to and utilized CBS login credentials and email address, communicating under the name "Meko" (Pl. Exs. 243, 262, 265, 52A at HUNTER000409; Pl. Exs. 51A, 52A, and 146A.

[10] *See also* ECF #228, PageID 7424-7429, 7482-7490, 7499-7570; Pl. Ex. 74A; Pl. Ex. 202A; Pl. Ex. 2013 and Pl. Ex. 146a at HUNTER000495, 535, 542, 554-55, 561, 567, 569, 587, 597, 686, 638, 644, 655, 658, 672, 674, 697-701, 702, 704, 713, 719, 725, 726.

including filling out energy suppliers contracts, determining commission structure for CBS agents, monitoring agents' calls, and contacting suppliers for payments, sometimes under the name and CBS email address of "Mike Robinson."[11] In March of 2018 he provided training to Robert Heinrich and in June of 2018 he trained and gave credentials to Madison Clement. (Clement ECF #229, PageID 7656-7658, 7661-7664; Pl. Ex. 93).

Evidence also shows Mr. Staples was also instrumental in the creation of Consumers Energy Bureau, which Integrity argues is nothing more than a "sham entity," operated under Defendants' direction for the purpose of evading prohibited conduct in violation of the Agreement. In February of 2019, Mr. Staples introduced Dominik Pearson, an individual with ties to the Staples family and an employee of one of Mr. Staples's businesses, to Defendant Hunter and Mr. Gilmore as someone interested in starting an energy company. Mr. Pearson testified that he filed the requisite paperwork and created Consumers in February of 2019. (Pearson ECF #229, PageID 7782, 7785-7789).

Defendants argue Consumers is a single member LLC, with which it only has an independent contractor relationship with for the purpose of providing back-office support. At the hearing, however, Plaintiff established that Mr. Staples, Defendants, and CEB are intricately connected, as CBS has received all money earned by Consumers since its inception, including commissions and profits (Pearson ECF #229, PageID 7790-7792), Consumers has no bank account (Pearson ECF #229, PageID 7790, Consumers pays no taxes (*Id.* at PageID 7791), and Consumers has no discernable payroll or financial records demonstrating expenses or revenue because its expenses are paid and revenue is received by CBS. (*Id.* at PageID, 7796-7797).

---

[11] The record shows Mr. Staples utilized fictitious names and email addresses under "Mike Robinson" for the purpose of conducting business on behalf of CBS. (Pl. Exs. 143A, 215, 215, 218, 243, 262, 263, 265, 266).

All commissions, whether they are for Defendants or Consumers, go directly to CBS and it is CBS that pays agents, including Ms. Efford, Ms. Robinson, and others, via a "Cash App" account directly connected to CBS's bank account. (Gilmore ECF #230, PageID 7893; Hunter ECF #229, PageID 7605, 7625-7626). Testimony also proves CBS facilitates CEB's "training, documents, materials, software, licensing, equipment, and back-office support." (Pearson ECF #229, PageID 7811).

Mr. Staples serves as the Director of Operations of CEB, despite having a non-compete with Integrity at the time he assumed the role. (Pearson ECF #229, PageID 7785, 7795-7796). As Director of Operations, Mr. Staples has used CEB to hire former Integrity employees subject to non-competes, including Ms. Efford and Ms. Robinson, for whom he provided payroll, credentials, training and supervision. (Pearson ECF #229, PageID 7795-7797). Although Mr. Pearson is listed as CEB's president and owner, he has no experience in the energy business, provides no services to CEB, is not in possession of any CEB documents, and does not have a CEB email address or phone number. (Pearson ECF #229, PageID 7786, 7790-7791, 7794-7797).

The evidence makes clear Defendants and Mr. Staples used Consumers, which operates as an affiliate of CBS given its extensive control over it, for the purpose of circumventing the Agreement's restrictions. At the hearing, Expert Bober testified regarding the extent to which Defendants' benefited from Mr. Staples's work, explaining that in 2017 Defendants operated at a loss prior to Mr. Staples's involvement, and experienced a tremendous growth in revenue in 2018 and 2019 attributable to his services on behalf of Defendants. (ECF #230, PageID 8035-8042, 8045-8047). Specifically, Expert Bober found the services Mr. Staples provided since his departure from Integrity in January of 2018 were pivotal in Defendants' growth, resulting in an enterprise value of $3.5 million, inclusive of all profits generated by those former Integrity employees from

whom Defendants, with the help of Mr. Staples, solicited and accepted services from in violation of the Agreement, as discussed herein in further detail. (Pl. Exs. 133A, 134A, and 238; Bober ECF #230, PageID 8041-8042).

## 2. **Robert Heinrich**

Robert Heinrich worked for Integrity until March of 2018 and signed a non-compete agreement that expired on March 26, 2020. (Nero ECF #230, PageID 7912, 7914; Pl. Ex. 259; Pl. Ex. 273). Evidence shows soon after his departure, Mr. Heinrich began providing services for CBS out of his Cleveland, Ohio home as a sales agent under the name "Will Taylor." (ECF #215, Joint Stipulation PageID 7312; ECF #229 PageID 7655-7656). On March 26, 2018, the day of his resignation from Integrity, CBS provided training for Mr. Heinrich, and in April of 2018, Mr. Staples gave Mr. Heinrich CBS credentials and an email address under "wtaylor@cbsworks.net". (Pl. Ex. 52A at HUNTER000410; Pl. Ex. 149).

Payroll information provided by Defendants confirms payments to Mr. Heinrich in 2018, 2019, and 2020, with evidence showing he received additional payments under the table prior to the execution of the Agreement. (Pl. Ex. 146A at HUNTER000704). Based on the available data, Expert Bober attributes at least $96,545.00 in damages to Mr. Heinrich. (Pl. Ex. 260).

## 3. **Madison Clement**

Under the supervision of Robert Staples, Madison Clement provided services for Integrity from March 2017 to February 23, 2018, and she signed a non-compete with Integrity that expired on February 23, 2020. (Clement ECF #229, PageID 7647-7648; Nero ECF #230, PageID 7922-7923; Clement ECF #229, PageID 7651; Pl. Ex. 270). Although Defendants deny her involvement, records show Ms. Clement first began providing services to CBS as a lead generator out of Mr.

Heinrich's Cleveland home as early as June 2018. (Clement ECF #229, PageID 7656-7658, 7661-7664; Pl. Ex. 93).

Ms. Clement was given training and CBS credentials with the email address "Kpenn@cbsworks.net," she worked on CBS's systems on June 15, 2018, and attempted to sell energy on behalf of CBS from June 2018 through at least October of 2018. (Pl. Ex. 93; Clement ECF #229, PageID 7656-7658, 7661-7664; Pl. Ex. 95, 221, 245). In September and October of 2018, Ms. Clement worked for CBS from their Euclid, Ohio office. (Clement ECF #229, PageID 7662-7664). When requested, Mr. Hunter denied Ms. Clement any information regarding her employment with CBS. (Clement ECF #229, PageID 7666, 7669). However, the record shows discussions by Mr. Hunter, Mr. Gilmore, and Mr. Staples regarding her employment (Pl. Ex. 146A at HUNTER000542, 000540, 000533, 000530, 000532, 000508), and paperwork confirms Ms. Clements filled out a CBS application in September of 2018 and received pay at least two times in October 2018. (Pl. Ex. 221; Pl. Ex. 245; Pl. Ex. 146A at HUNTER000533). Because Defendants did not provide any sales records or information related to Ms. Clement, Expert Bober was unable to provide a damages calculation with respect to the services she performed, but evidence shows at least one prohibited sale. (Clement ECF #229, PageID 7656-7657; Pl. Ex. 95).

### ii. Solicitation and Acceptance of Services from Restricted Individuals in Violation of Paragraphs 10(b) and 10(c)

Integrity alleges Defendants committed numerous violations of the Agreement by accepting services from Latoya Robinson, Ciairrea Efford, Margaret McLaughlin, John Kennedy, Robert Staples, Madison Clement, Robert Henrich, and Rebecca Ward, in violation of Paragraph 10(b) of the Agreement, which prohibits Defendants, including all other current employees or agents of Defendants, from "employing, contracting with or accepting services from any current or former Integrity employees, contractor or vendor who has a Integrity non-competition

12

agreement in effect." Plaintiff also alleges Defendants breached Paragraph 10(c), which prohibits Defendants from "soliciting or encouraging any current employee to terminate his/her relationship with Integrity," by soliciting Latoya Robinson and Ciairrea Efford to terminate their relationships with Integrity. (Pl. Ex. 146A at HUNTER000554 and 000632.

## 1. Rebecca Ward

Rebecca Ward started providing services to CBS in September of 2018. (Pl. Ex. 27A, 222, 246). Ms. Ward left Integrity in September of 2017 and signed a non-compete agreement that expired on September 19, 2019. (Nero ECF #230, PageID 7913; Pl. Ex. 259; PageID 7914; Pl. Ex. 269). CBS paperwork shows Ms. Ward filled out a CBS employment application in September of 2018 and payroll records demonstrate she received payments in October of 2018 through April of 2019. (Pl. Ex. 267; Pl. Ex. 222; Pl. Ex. 246). CBS contends that it terminated Ms. Ward's employment on August 21, 2019, after first contesting her signature on an Integrity non-compete. (Hunter ECF #232, PageID 8328-8329). Based on the sales records provided by Defendants, Expert Bober's projected damages associated with Ms. Ward is $46,288.00. (Pl. Ex. 260).

## 2. Ciairrea Efford

Ciairrea Efford left Integrity in May of 2019 and signed a non-compete agreement that expired on May 21, 2021. (Nero ECF #230, PageID 7919-7921; Pl. Exs. 116, 240 and 259; Pl. Ex. 4 at p. 18-23). Evidence shows that while still employed with Integrity, Ms. Efford provided services to CBS and Consumers under the name "Karen Baxton" as early as March of 2019. Pl. Ex. 146A at HUNTER000633, 000632, 000626; Hunter ECF #228, PageID 7536-7537; Pl. Ex. 146A at HUNTER000554, 000553; ECF #215). Although Plaintiff's damage calculation is limited to the record provided by Defendants and BOX commission statements that go through January 31, 2020, Expert Bober found that Ms. Efford was a lucrative agent for CBS who generated

approximately $40,824.00 in profits. (Pl. Ex. 260; *see* Bober ECF #231, PageID 8709-8110, 8114, 8116-8118).

### 3.  LaToya Robinson

LaToya Robinson was employed by Integrity until March of 2019 and signed a non-compete that expired on March 8, 2021. (Nero ECF #230, PageID 7917-7919; Pl. Exs. 102, 259; Pl. Ex. 4 at p. 36-48). Evidence demonstrates Ms. Robinson performed services for CBS and Consumers under the name "Taylor Hill" in early March of 2019. (Hunter ECF #228, PageID 7524-7526; Pl. Ex. 254; Pl. Ex. 74A). Records also shows that Defendants solicited the departure of Ms. Efford and Ms. Robinson around the same time. (Pl. Ex. 146A at HUNTER00632, 000626). Like Ms. Efford, Ms. Robinson was an extremely productive agent for CBS, and based on available information, Expert Bober found an estimated $35,824.00 in profits associated with her sales. (Pl. Ex. 260).

### 4.  Margaret McLaughlin

Margaret McLaughlin left Integrity in January of 2019 and her non-compete expired on January 20, 2021. (Nero ECF #230, PageID 7915-7916; Pl. Exs. 252 and 259; Pl. Ex. 4 at p. 30-35). Evidence shows she began communicating with CBS as early as January of 2019, including conversations with Mr. Gilmore regarding services and compensation in February and March of 2019. (Pl. Ex. 73A; Gilmore ECF #230, PageID 7836-7840; Pl. Ex. 73A; Hunter ECF #228, PageID 7523-7525; Pl. Ex. 146A at HUNTER000638, 000612). Based on the limited information made available, Expert Bober approximated Ms. McLaughlin generated $1,390.00 in sales. (Pl. Ex. 254; Pl. Ex. 260).

### 5. John Kennedy

John Kennedy was employed by Integrity until February 23, 2018 and signed a non-compete agreement that expired on February 23, 2020. (Nero ECF #230, PageID 7923-7924; Pl. Ex. 264; Pl. Ex. 272). Plaintiff provides evidence demonstrating that Mr. Staples solicited Mr. Kennedy's contact information and correspondence from Ms. Clement in August of 2018, and discussed Mr. Kennedy's intention to come sign paperwork with Defendants soon after. (Clement ECF #229, PageID 7651-7653; Pl. Ex. 220A; Gilmore ECF #230, PageID 7851; Pl. Ex. 220). Because Defendants failed to provide any records pertaining to the services Mr. Kennedy provided, Expert Bober could not determine a damages value associated with his work.

### iii. Work Performed by Amber Acoff in Violation of Paragraph 8(b)

Amber Acoff worked for Integrity until May 25, 2017 and the terms of the Agreement prohibited her from selling energy in the state of Ohio until June 22, 2020. (Pl. Ex. 128, ¶ 4; 8(b)). Evidence shows Ms. Acoff made at least one sale in Ohio during the restricted time period, resulting in approximately $1,731.00 in damages to Integrity, based on Expert Bober's analysis. (Pl. Exs. 260, 261; Bober ECF #230, PageID 8031-8033).

## III. DAMAGES & ATTORNEYS' FEES AND COSTS

Integrity claims it has suffered significant harm and damages, including lost profits, customers, and enterprise value, as a direct and proximate result of Defendants' breaches of the Agreement. (ECF #236, PageID 8491). Plaintiff also contends Defendants benefited from its own violative conduct and exacerbated litigation expenses with continued denials of wrongdoing, protracted litigation tactics, and failure to remedy its breaches. Integrity requests an award of monetary damages, attorneys' fees, and costs incurred to enforce the Agreement, and injunctive relief.

## A. Integrity is Entitled to Enterprise Value Damages

Integrity argues it is entitled to disgorgement of the enterprise value that Defendants gained as a result of breaching the Agreement. (ECF #236-1). At the evidentiary hearing, Plaintiff offered the expert testimony of Expert Bober to support its claim for an award of CBS's enterprise value, which Expert Bober opines is the best way to quantify the resulting damages from Defendants' continuous breaches of the Agreement and Mr. Staples's significant involvement in CBS's growth. (Bober ECF #230, PageID 8046-8047).[12] Specifically, Expert Bober found that following Mr. Staples's involvement in Defendants' operations, CBS's growth resulted in an estimated enterprise value in excess of $3.5 million, including all profits generated by former Integrity employees in violation of the Agreement. (Bober ECF #230, PageID 8018-8019, 8044; Bober ECF #231, PageID 8096, 8116-8118).

Under Ohio law, "loss of business value is calculated by measuring the difference between the value of the business before the breach and the value of the business after the breach." *JGR, Inc. v. Thomasville Furniture Indus.*, 830 F.Supp. 2d 358, 369-370 (N.D. Ohio 2011, citing *Taylor v. B. Heller & Co.*, 364 F.2d 608, 612 (6th Cir. 1966). "The proper method of valuing a business to determine injury is the capitalization of the business's earnings over a reasonable period." *Taylor*, 364 F.2d at 613.[13] Integrity argues an award of CBS's enterprise value, with consideration of lost profits attributable to Defendants' breaches subsumed in Expert Bober's $3.5 valuation, is

---

[12] Plaintiff's Expert, Mr. Bober, is a Certified Public Accountant ("CPA"), accredited in the field of business valuation and financial forensics by the American Institute of CPAs. He holds a Certified Valuation Analyst degree through the National Association of Certified Valuators and Analysts, has testified as an expert in the field of business valuation and forensic financial services in over 90 cases, and has previously provided valuations in the energy industry. (Bober ECF #230, PageID 8004-8005, 8007). In this case, Expert Bober submitted his initial report in February of 2021, and a revised calculation following the Court's hearing to include an analysis of damages associated with Mr. Staples.

[13] Plaintiff notes in its briefings that there are several different established approaches to determining loss of business value, including a "profit-based approach" and a "fair market value approach," and directs the Court to Judge Sara Lioi's discussion in *JGR Inc. v. Thomasville Furniture Indust.*, 748 F. Supp. 2d 748, 575 (N.D. Ohio 2010), (vacated and superseded by 830 F. Supp. 2d 358).

the appropriate damages award under the law. "Lost profits may be recovered following a breach of contract, so long as the existence of lost profits is not remote, uncertain, or speculative…it is wholly appropriate" that ill-gotten profits "be disgorged under a traditional damages analysis, since lost profits are recoverable as damages for breach of contract." *Stewart Title Co. v. First Am. Title Ins. Co.*, 44 F. Supp.2d 942, 956 (W.D. Tenn.1999).

Expert Bober testified to the Court that his $3.5 million enterprise value calculation includes damages associated with all former Integrity employees providing services to Defendants and work performed by Mr. Staples on behalf of Defendants, in violation of the Agreement. (Bober ECF #230, PageID 8042, 8044; Bober ECF #231, PageID 8091; Pl. Ex. 146A). He explained that he based his calculation on a review of all records made available by Defendants relating to its financial performance in 2017, 2018, and 2019, so that his analysis would encompass CBS's financial status both before and after Defendants' breaches. (Bober ECF #230, PageID 8035-8042).

Based on the available data, Expert Bober obtained his $3.5 million valuation by utilizing well-known industry sources and a "capitalized income approach":

> Taking the ordinary business revenue income reported on the tax returns, tax-affecting it and then capitalizing it at the – the equity capitalization rate that was Build-up, that I build up as using a well-regarded, the most widely used method, the Build-Up method using Duff & Phelps, formerly known as Ibbotson, to arrive at the $3.5 million value.

(ECF #230, PageID 8034-8035; 8044; 8045-8046).

Expert Bober found a drastic increase of revenue reported on CBS's taxes[14] and 1099s from at least one vendor showing revenue from 2017 to 2019, and a "significant compounded annual

---

[14]

CBS's tax records for 2017: **$75,000.00 with a loss of $59,915.00** (Pl. Ex. 133A);
CBS's tax records for 2018: **$363,443.00 with a profit of $176,303.00** (Pl. Ex. 13A); and

growth rate in business," which he primarily attributes to Robert Staples. (ECF #230, PageID 8041; ECF #231, PageID 8117, L.7-25). Notably, Defendants reported a loss of approximately $59,915.00 in 2017 and revenue exceeding $1 million in 2019, as evidenced in its tax returns and SBA loan submission.[15]

Defendants offered no rebuttal to Expert Bober's credibility, methodology, or calculation techniques at the hearing, and they provide no information or evidence to contradict or explain their rapid financial growth since Mr. Staples's involvement. While CBS now argues that Mr. Bober's enterprise value is "wrapped in speculation" because it relies on "inaccurate and incomplete information," the Court notes that the parties engaged in over a year of discovery, and nothing precluded Defendants from producing mitigating evidence or a more complete picture of its financials. Plaintiff sought key documents to discern CBS's financial performance, and Defendants either refused to produce or had no responsive records.[16]

---

CBS's tax records for 2019: **$1,118,830.00** (Pl. Ex. 242) and other data for 2019: **$1,310,412.94** (Pl. Ex. 238).

[15]

THE COURT: So what do we attribute to Mr. Staples?

***

THE WITNESS: Yeah, Your Honor, if I could address that. So on the basis that was just articulated in terms of, you know, subject via a claim that he, based upon those messages, was running the business, the entire business, the profitability of the business and the revenues generated by virtue of breaching the settlement agreement, he was integrally involved with the whole business strategy and generating those revenues and getting the business to where it was at in such a short period of time, and the supplemental report that services the $3.5 million damage amount is based upon what's the value of that cash flow stream in its entirety. So the entire – that encompasses the entire value of the business. (Bober ECF #231, PageID 8117, L.7-25).

[16] (1) Mr. Hunter has not filed any tax returns from 2017 to the present (ECF #229, PageID 7639); (2) Brian Gilmore has not filed any tax returns for the period of 2017 to the present (ECF #230, PageID 7832-7833); (3) CBS has filed tax returns for 2017 and 2018, but not for 2019 (Pl. Ex. 2422; Bober ECF #231, PageID 8084-8087); (4) CBS claimed that the 2019 tax return that Integrity received from CBS's accountant was a "draft" (*Id.*); (5) It is unknown whether CBS intends to filed tax returns for 2019 or 2020; CBS did apply for a PPP loan through the Small Business Administration in which CBS represented its gross revenue for the 12 month period ending on January 31, 2020 was $1,310,412.94 (Pl. Ex. 238; Bober ECF #231, PageID 8092-8094; (6) CBS provided limited financial information pertaining to its payroll, expenses, and revenue (ECF #228, PageID 7407-7408, where Mr. Hunter testified that there was no rhyme or reason as to how disbursements were made); (7) Consumers has never filed tax returns, has no bank

Expert Bober's enterprise value calculation is reasonably based on his review of all information made available pertaining to CBS's financial performance from 2017 to 2019, factoring in costs, cancellations, and renewal rates, and utilizing the recognized capitalization of earnings approach. (Bober ECF #230, PageID 8035-8042, 8045-8047). The record shows Defendants' experienced significant growth in revenue from its numerous breaches of the Agreement and Mr. Staples's continued involvement, and finds Plaintiff is entitled to the $3.5 million enterprise value, inclusive of all lost profits, as requested.

### B. Integrity is Entitled to Attorneys' Fees, Costs, and Expenses Incurred in Enforcing the Settlement Agreement

Ohio law provides that parties who successfully enforce settlement agreements in courts may recover their reasonable attorneys' fees and expenses incurred in enforcing the settlement. *Rohrer Corp. v. Dane Elec. Corp*, U.S.A., 482 Fed. Appx. 113, 117 (6th Cir. 2012). While Ohio adheres to the rule that, "a prevailing party in a civil action may not recover attorneys' fees as a part of the costs of litigation," *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, at ¶ 7, "attorneys' fees are allowed as compensatory damages when the fees are incurred as a direct result of the breach of a settlement agreement." *See Raymond J. Schaefer, Inc. v. Pytlik*, 6th Dist. Ottawa No. OT-09-026, 2010-Ohio-4714, ¶ 34; *see also Rayco Mfg. v. Murphy, Rogers, Sloss & Gambel*, 8th Dist. Cuyahoga No. 106714, 2019-Ohio-3756, ¶ 6, 17, 142 N.E.3d 1267 ("Allowing the recovery of attorneys' fees as compensatory damages on a motion to enforce a settlement agreement is consistent with the strong public policy that exists in encouraging settlement and enforcing settlement agreements.").

---

account, and presented no financial record-keeping pertaining to its payroll or other expenses. (Pearson ECF #229, PageID 7790-7796).

While the Settlement Agreement does not explicitly provide for such relief, "Ohio law allows a court to award attorney's fees as compensatory damages when a party's breach of a settlement agreement makes litigation necessary, even where none of the exceptions to the American Rule have been shown." *Olszewski v. Cleveland Clinic*, 2020 U.S. Dist LEXIS 185064 at *20, quoting *Rohrer Corp. v. Dane Elec. Corp. USA*, 482 Fed. App'x 113, 117 (6th Cir. 2012). In determining the reasonableness of fees sought, courts generally start with the number of hours reasonably expended on the matter multiplied by a reasonable hourly rate, commonly referred to as the lodestar calculation. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983); *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S. Ct. 939, 103 L. Ed. 2d 67 (1989). "This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley*, 461 U.S. at 433.

However, this does not end the Court's inquiry into the reasonableness of the fees to be awarded. "Upon determining the lodestar, a district court also has discretion to decide whether an upward or downward adjustment is warranted in order to reach a reasonable fee award." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 Fed. Appx. 496, 499-500 (6th Cir. 2011)(citing *Geirer v. Sundquist*, 372 F.3d 784, 792(6th Cir. 2004)). The Court may consider the following factors when determining whether an adjustment is appropriate:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Hensley v. Eckerhart*, 461 U.S. 424, 430 n.3, 103 S.Ct. 1933, 76 L. Ed. 2d 40 (1983)(citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

Integrity seeks all fees, expenses, and costs incurred from June of 2019, when it began its

efforts to seek enforcement of the Agreement, through the present. Specifically, Integrity requests

attorneys' fees in the amount of $753,667.00 which accounts for a total of 2,393 hours billed by

Zashin & Rich from June 1, 2019 through April 30, 2021, broken down as follows:

| Biller | Hours | Rate | Amount |
|---|---|---|---|
| Stephen S. Zashin (Partner) | 323.3 | $475 | $153,567.50 |
| Ami J. Patel (Senior Level Attorney) | 1103.62 | $350 | $386,267.00 |
| Lauren M. Drabic (Senior Level Attorney) | 125 | $285 | $35,625.00 |
| Christopher D. Caspary (Junior Attorney) | 22.8 | $250 | $5,700.00 |
| Julia G. Ross[17]    (Junior Attorney) | 6.9 | $125 | $862.50 |
|  | 669 | $230 | $153,870.00 |
| Quentin L. Sims (Law Clerk) | 5.6 | $125 | $700.00 |
| Zachary L. Humphrey    (Paralegal) | 136.6 | $125 | $17,075.00 |
| **TOTAL** | 2,392.82 |  | **$753,667.00** |

Integrity also requests $15,000.00 in additional attorneys' fees incurred in May of 2021 for work

performed on its post-hearing submissions, for a total of $768,667.00.

Defendants do not object to or challenge counsel's hourly rates, credentials, or level of

expertise in this matter. Attorney Zashin, partner of Zashin & Rich, is a graduate of the Wharton

School of Business at the University of Pennsylvania, Case Western Reserve University

Weatherhead School of Management, and Case Western Reserve University School of Law. He is

certified by the Ohio State Bar Association as a Specialist in Labor and Employment Law, has

been recognized by the Best Lawyers in America and Ohio Super Lawyers since 2014 and 2010,

respectively, and he and his firm have tried numerous employment-related cases. (Zashin Dec.,

ECF #242-1).

The Court finds the hourly rates billed by Attorney Zashin, senior and junior level

attorneys, law clerks, and paralegals on this matter are within the customary hourly rates of

---

[17] Ms. Ross billed at a paralegal hourly rate until she became licensed to practice law in the state of Ohio in November of 2019.

practitioners with similar credentials and experience who regularly appear before the Court. The Court considered the breadth of work, level of complexity, and skill needed to competently perform the legal services required in this matter, and find the rates reasonable.

Defendants claim Integrity seeks fees for work that was unnecessarily performed only to "harass and destroy" CBS's business and for work not associated with pursuing enforcement of the Agreement. Defendants argue that neither the law nor the facts support the requested attorneys' fees in this matter, and even if they did, an award of attorneys' fees would be inappropriate because CBS acted in good faith throughout the entirety of this litigation. (ECF #246).

Defendants' arguments are not well-taken. Evidence proves Defendants routinely engaged in a variety of conduct prohibited under the terms of the Agreement. After futile requests for Defendants' compliance, Plaintiff filed its Motion to Enforce the Settlement Agreement and commenced its investigation into the extent of CBS's breaches. Integrity emphasizes that its discovery efforts were necessary to unravel facts Defendants did not make available or those which could not be determined from CBS's unorthodox record-keeping and failure to produce. Plaintiff documents with specificity the tremendous time and effort it expended to investigate CBS's wrongdoing and pursue enforcement of the Agreement, as thoroughly explained in Attorney Zashin's declaration:

> Only after extensive discovery, exacerbated by Defendants' continued denial of its breaches and refusal to cure them – along with their protracted, distracting and unnecessary litigation tactics, evasiveness, lack of records, use of fictitious names and entities, and reliance on highly misleading (if not outright false) affidavits – did Integrity learn the full extent of Defendants' violations of the Settlement Agreement and the depths Defendants went to conceal them. All told, it took significant written discovery, more than forty (40) third-party subpoenas, and the deposition of sixteen (16) fact witnesses, and a financial expert deposition to get to the bottom of Defendants' multiple breaches and the extensive damages caused by those breaches.

(ECF #242, Zashin Decl.; *see also* ECF #242, including charts at PageID 8668-8670).

Plaintiff incurred fees deposing more than 15 witnesses and issuing more than 40 third-party subpoenas, resulting in considerable transcript and subpoena compliance fees for information it could not compel from Defendants and for records necessary to piece together critical information Defendants withheld, for a total of $58,686.79 in costs and expenses.

Plaintiff also incurred expenses engaging Expert Bober, who Plaintiff proves was essential in determining the economic damages attributable to Defendants' breaches and who had to produce two reports due to CBS's failure to provide relevant information. Expert Bober's first report in February of 2021 focused primarily on Integrity's lost profits associated with the sales of commercial energy and quantified damages related to sales made by Ms. Acoff, Mr. Heinrich, Ms. Ward, Ms. Efford, Ms. Robinson, and Ms. McLaughlin through January 31, 2020, based on the incomplete data provided.

After issuing dozens of subpoenas, Integrity received information from Defendants' accountant relating to CBS's financial performance and the extent of Mr. Staples's impact on its financial growth. With the newly obtained information, Expert Bober supplemented his findings to calculate an enterprise value better reflective of Mr. Staples's significant role in Defendants' breaches and considerable increase in revenue for 2018 and 2019, costing plaintiff a total of $23,275.50 in expert fees. (Zashin Decl., ¶ 23).

In sum, Plaintiff incurred attorneys' fees in the amount of approximately $768,667.00 (through the present); $22,563.45 in deposition costs; $11,513.45 in subpoena, electronic discovery related expenses; $23,532.75 in expert and witness fees; and $24,609.89 in hearing presentation and other expenses, totalling $850,886.54. (ECF #242, PageID 8673-8674).

The purpose of compensatory damages is "to make the aggrieved party whole," so that the party would be in the same position if the agreement would have been performed or the harm had

not occurred. *Rayco*, 2019-Ohio-3756 at ¶ 12. "Where a party breaches a settlement agreement and the breach causes the nonbreaching party to incur attorneys' fees through continued litigation to enforce the settlement agreement, the nonbreaching party has lost an essential benefit of its bargain." *Id.*, ¶ at 13. Public policy supports an award under these circumstances, and is in keeping with the Court's position that without an award of attorneys' fees as compensatory damages, a party who had a 'change of heart' regarding its obligations under the agreement would "have nothing to lose by refusing to comply…" *Id.*, ¶ at 18.

Plaintiff's application for fees is exhaustive, thorough, and well-supported by Attorney Zashin's declaration, Plaintiff's invoice submissions for work performed by counsel, and the evidentiary record. Based upon a thorough review of the submission of accounting by Plaintiff including counsel's qualifications and experience, explanation of hourly rates and work performed, and supporting evidence, the Court finds counsel's hourly rates are reasonable and in line with the prevailing attorneys' rates with similar experience and qualifications.

The Court also finds that Plaintiff's request for fees, costs, and expenses as outlined in its briefings and supporting declaration were necessarily and reasonably incurred by counsel representing Integrity in seeking enforcement of the June 22, 2018 Settlement Agreement. The information sought through discovery was critical in determining the extent of Defendants' breaches and Mr. Staples's impact so that a comprehensive damages calculation could be performed. Defendants only complicated this process by their own lack of transparency, necessitating third-party subpoenas and a second expert report. Defendants had a full and fair opportunity to respond to the briefings and supporting documentation filed by Integrity and their arguments have been thoughtfully considered. The court finds that the time, effort, and costs

incurred by Plaintiff are reasonable under the circumstances and Integrity is entitled to compensatory damages in the form of attorneys' fees as requested.

## IV. CONCLUSION

The evidentiary record establishes that Defendants CBS, Mr. Hunter, and Ms. Acoff breached the June 22, 2018 Settlement Agreement and the Court finds Plaintiff Integrity Energy is entitled to an award of monetary damages, attorneys' fees, costs, and expenses, and injunctive relief, as described herein and ordered below. Accordingly, Plaintiff's Motion to Enforce the Settlement Agreement (ECF #10) is **GRANTED**.

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

 a. Defendants shall pay Integrity $3.5 million as damages for their breaches of the Agreement;

 b. Integrity is entitled to an award of reasonable attorneys' fees, costs, and expenses incurred in seeking enforcement of the Agreement, as compensatory damages, in the amount of $850,886.54;

 c. Defendants, including CEB, shall cease employing, contracting with, or accepting services from any current or former Integrity employee;

 d. Defendants, including CEB, shall cease spending or liquidating all assets, profits, earnings, and moneys received as a result of selling or providing energy related services, including but not limited to, all earnings, profits, or moneys received from June 22, 2018, the date upon which Defendants entered the Confidential Settlement Agreement, until the present;

 e. Defendants, including CEB, shall cease performance of all functions in violation of Paragraph 10 of the Settlement Agreement; and

    f.   Defendants, including CEB, direct all revenue directly from energy suppliers, brokers or vendors directly to Integrity until the full damages award, including attorneys' fees, costs and expenses, are paid in full.

IT IS SO ORDERED.

_____

DONALD C. NUGENT
Senior United States District Judge

DATED: _____